

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-2003

# In Re: Kiwi Intl Air

Precedential or Non-Precedential: Precedential

Docket No. 02-1037

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: Kiwi Intl Air " (2003). *2003 Decisions*. Paper 225.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/225

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 25, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-1037, 02-1038, and 02-1654

In re: KIWI INTERNATIONAL AIR LINES, INC.

SIMON KIMMELMAN, TRUSTEE IN BANKRUPTCY
                                 Appellant in no. 02-1037

v.

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

SIMON KIMMELMAN, TRUSTEE IN BANKRUPTCY
                                 Appellant in no. 02-1038

v.

SABRE DECISION TECHNOLOGIES, INC.

SIMON KIMMELMAN, TRUSTEE IN BANKRUPTCY
                                 Appellant in no. 02-1654

v.

CIT GROUP/CREDIT FINANCE, INC. a/k/a
THE CIT GROUP, INC.

On Appeal from the United States District Court
for the District of New Jersey
(Civil Action Nos. 00-2841, 00-2843, and 00-2842)
District Judge: The Honorable Joseph A. Greenaway, Jr.

Argued: December 12, 2002

Before: FUENTES and STAPLETON, *Circuit Judges* and
O'KELLEY,* *District Judge*

(Opinion Filed: September 25, 2003)

JEFFREY S. POSTA, ESQ. (Argued)
Sterns & Weinroth, P.C.
50 West State Street
Suite 1400
P.O. Box 1298
Trenton, NJ 08607-1298

*Counsel for Appellant Simon
Kimmelman, Trustee*

ANNE M. TANNENBAUM, ESQ.
 (Argued)
HUGH H. WELSH, ESQ.
MICHAEL E. JANKOSKI, ESQ.
The Port Authority of New York and
 New Jersey Law Department
Opinions & Appeals Division
225 Park Avenue South
13th Floor
New York, NY 10003

*Counsel for Appellee The Port
Authority of New York and
New Jersey*

STEPHEN C. STAPLETON, ESQ.
 (Argued)
MARICELA R. MOORE
Cowles & Thompson, P.C.
901 Main Street
Suite 4000
Dallas, TX 75202

*Counsel for Appellee Sabre Decision
Technologies, Inc.*

---

* The Honorable William C. O'Kelley, United States District Judge for the Northern District of Georgia, sitting by designation.

JAMES M. PECK. ESQ. (Argued)
ALIX S. PUSTILNIK, ESQ.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

DAVID WOLFF, ESQ.
Hellring Lindeman Goldstein
 & Siegal LLP
One Gateway Center
Newark, NJ 07102-5386

*Counsel for Appellee The CIT Group Credit Finance, Inc. a/k/a The CIT Group, Inc.*

---

## OPINION OF THE COURT

---

FUENTES, *Circuit Judge*:

In this consolidated bankruptcy appeal, the trustee for the debtor, Kiwi International Air Lines, Inc., appeals the dismissal of three preference actions he brought against a number of Kiwi's creditors to recover nearly $3.9 million in payments Kiwi made to the creditors before it filed a petition for reorganization. Kiwi made the payments in all three cases pursuant to a number of written agreements that were essential to its efforts to stay in business. Some time after Kiwi filed its bankruptcy petition, it assumed the agreements. The trustee claims that, in each case, the pre-petition payments constituted preferential transfers and were thus voidable under section 547(b) of the Bankruptcy Code. Both the Bankruptcy Court and the District Court disagreed. Because we concur with these courts that (1) the assumption of a contract under 11 U.S.C. § 365 bars a preference claim by a trustee and (2) section 1110 of the Code precludes a trustee from bringing a preference action to recover payments made on aircraft equipment leases, we affirm.

## I.   *Facts and Procedural Background*

On September 30, 1996, Kiwi International Air Lines Inc. ("Kiwi" or "debtor") filed a petition for reorganization

pursuant to Chapter 11 of the Bankruptcy Code. Prior to seeking bankruptcy relief, Kiwi had been in the business of operating a commercial airline offering both scheduled and chartered air transportation and related services. Some time within 90 days before Kiwi filed its Chapter 11 petition, it made a number of payments to different creditors pursuant to existing arrangements that it had with those creditors: (1) $1,551,000 to the Port Authority of New York and New Jersey ("Port Authority"); (2) $192,555 to the Sabre Group, Inc. or its predecessor ("Sabre"); and (3) $2,148,554 to the CIT Group/ Capital Transportation, Inc. ("CIT Group" or "CIT"). These transactions are at the center of the dispute between the trustee and the defendants. Shortly after its bankruptcy filing, Kiwi suspended operations due to a lack of cash necessary to fund its daily operations. The company resumed flight operations only after obtaining substantial outside capital from an investor named Dr. Charles Edwards who owned an entity named Kiwi International Holdings, Inc. ("KIH"). (Trustee's Br. in CIT, at 12). In June 1997, Kiwi filed a motion for an order approving the sale of its assets to KIH.

After numerous days of hearings, on July 18, 1997, the Bankruptcy Court approved a compromise among Kiwi, KIH, the Creditors' Committee, and Northwest Airlines, Inc., a creditor of Kiwi's bankruptcy estate. Consistent with the compromise, the Bankruptcy Court entered a Consent Order approving the settlement as well as a Sale Order authorizing Kiwi to sell substantially all of its assets to KIH. The sale transaction resulted in, among other things, the debtor's assumption and then assignment to KIH of several contracts which it had entered into pre-petition with each of the defendant creditors. Kiwi's assumption of these contracts is important because it enabled Kiwi to compel its creditors to continue performing under the assumed agreements, for the purpose of receiving contract benefits necessary to its operation as a going concern. Specifically, here, Kiwi assumed and assigned to KIH its operating agreement with the Port Authority in order to continue aircraft operations at Newark International Airport. Kiwi also assumed and assigned to KIH operating agreements it had with Sabre, under which Sabre provided the debtor with integrated technology services, including a

computerized reservation system, inventory control, scheduling, baggage management, flight operations and communications, and electronic distribution of Kiwi's inventory to travel agents and consumers. As a prerequisite to the assumption and assignment of the various agreements, the Bankruptcy Court ordered KIH to cure Kiwi's existing monetary defaults under the agreements and to provide adequate assurance of future performance under the agreements.

Additionally, in connection with the sale, the debtor assumed and assigned to KIH leases with the CIT Group for four airframes and twelve aircraft engines ("aircraft equipment"). Previously, the Bankruptcy Court had approved a stipulation between the debtor and CIT under which CIT agreed to permit the debtor to retain possession of the aircraft equipment it had leased to it pre-petition and Kiwi agreed to cure any and all defaults under the aircraft equipment leases and to make lease payments going forward.

The Sale Order entered by the Bankruptcy Court also approved the terms and conditions of a document it referred to as the "Term Sheet." According to the Term Sheet, all causes of actions, including preference actions, would not be transferred to KIH in the sale but would remain with the debtor's estate. Thus, potential preference claims against creditors were to be preserved for later prosecution by an estate representative such as the trustee. Notably, the Term Sheet provided that only preference actions against Northwest Airlines and Greater Orlando Airport were settled and that these creditors were to obtain releases from liability from KIH, Kiwi, and the Creditors' Committee.[1] All other preference actions were preserved by the Term Sheet. According to the trustee, Northwest Airlines paid $100,000 in consideration for the release it obtained.

On September 21, 1998, two years after Kiwi filed its bankruptcy petition, the Creditors' Committee filed a

---

1. Although the Term Sheet refers to a settled preference between Greater Orlando Airport and KIH, Kiwi, and the Creditors' Committee, the settlement was never consummated.

motion with the Bankruptcy Court seeking appointment of a Chapter 11 trustee or, in the alternative, conversion of the case to Chapter 7. The Committee asked the Court to immediately appoint a Chapter 11 trustee lest "causes of action of the debtor's estate which have been preserved by the Creditors' Committee for the benefit of creditors [ ] be virtually lost by the lapse of time. . . ." (Port Authority App. at 315). In response, on September 30, 1998, the Court appointed Simon Kimmelman as the Chapter 11 trustee for the debtor. A month later, the debtor's Chapter 11 case was converted to a Chapter 7 liquidation and Kimmelman was appointed Chapter 7 trustee for the debtor's estate.[2]

On April 30, 1999, Kimmelman, in his capacity as Chapter 7 trustee, filed separate adversary proceedings against the Port Authority, Sabre, and the CIT Group, seeking to recover, pursuant to 11 U.S.C. § 547, payments made by the debtor to each of the defendants during the 90 day period preceding its Chapter 11 filing. The trustee sought to recover $1,551,000 from the Port Authority, $192,555 from Sabre, and $2,148,554 from the CIT Group.

Following defendants' dismissal motions, the Bankruptcy Court dismissed each of the three § 547 actions brought by the trustee.[3] The Bankruptcy Court held, in all three cases, that the trustee could not recover payments made by the debtor pre-petition pursuant to agreements which the debtor later assumed and assigned to the buyer of its assets. With respect to the preference action against the CIT Group, the Bankruptcy Court held that the trustee's recovery was also barred by the debtor's earlier entry into a stipulation allowing it to retain possession of its leased aircraft equipment. The District Court affirmed the dismissal of each of the actions brought by the trustee.

2. On March 23, 1999, KIH also filed a Chapter 11 petition. On December 13, 1999, the Bankruptcy Court entered an order converting KIH's Chapter 11 case to a case under Chapter 7.

3. Specifically, the Court granted the motions to dismiss brought by the Port Authority and the CIT Group, which the Court treated as motions for summary judgment because they included materials outside of the pleadings, and granted the motion for summary judgment brought by Sabre.

Both courts reasoned that, because the debtor was required to pay the defendants all amounts in arrears in order to compel their continued performance of its agreements with them, the pre-petition payments by the debtor did not improve their positions in the bankruptcy and, therefore, did not constitute preferential transfers. The trustee timely filed a Notice of Appeal in each of the adversary proceedings.

## II. *Jurisdiction and Standard of Review*

The District Court had jurisdiction to review the Bankruptcy Court's orders dismissing the trustee's complaints pursuant to 28 U.S.C. § 158(a). This Court has jurisdiction to review the District Court's judgments under 28 U.S.C. §§ 158(d) and 1291.

Our standard of review over the District Court's bankruptcy decision is the same as that exercised by the District Court. *See In re Woskob*, 305 F.3d 177, 181 (3d Cir. 2002), *cert. denied*, 123 S. Ct. 1762 (2003). Accordingly, we review the Bankruptcy Court's findings of fact for clear error and exercise plenary review over the Bankruptcy Court's legal determinations. *See id.*; *see also In re Continental Airlines*, 125 F.3d 120, 128 (3d Cir. 1997), *cert. denied*, 522 U.S. 1114 (1998).

The Bankruptcy Court's grant of summary judgment in favor of the defendants was proper only if it appears that "there is no genuine issue as to any material fact and that [each of] the moving part[ies] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence, we "view [the] inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Bartnicki v. Vopper*, 200 F.3d 109, 114 (3d Cir. 1999) (citation omitted), *aff'd*, 532 U.S. 514 (2001).

## III. *Analysis*

The consolidated appeals before this Court concern the interplay between 11 U.S.C. § 547, the provision of the Bankruptcy Code authorizing a trustee or debtor in

possession[4] to recover certain preferential transfers made by the debtor pre-petition, and 11 U.S.C. §§ 365 and 1110, provisions of the Bankruptcy Code, authorizing a trustee, after curing defaults, to assume and assign executory contracts and unexpired leases, and to retain aircraft equipment post-petition, respectively. The trustee's primary contention is that the Bankruptcy and District Courts erred in concluding that the debtor's assumption of the agreements pursuant to § 365 precluded him from recovering pre-petition payments made by the debtor pursuant to § 547.

## A.  *Section 547*

We begin by turning to § 547 of the Bankruptcy Code. The purpose of this section is to facilitate "the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of its class [pre-petition] is required to disgorge so that all may share equally." 2 Collier on Bankruptcy ¶ 547.01 (15th ed. rev. 2003). Section 547(b) provides, in pertinent part:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> >
> > (3) made while the debtor was insolvent;
> >
> > (4) made—
> >
> > > (A) on or within 90 days before the date of the filing of the petition;
> >
> > ****
> >
> > (5) that enables such creditor to receive more than such creditor would receive if—

---

4. Section 1107 of the Bankruptcy Code provides that a debtor in possession has the rights and powers of a Chapter 11 trustee. *See* 11 U.S.C. § 1107(a).

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Defendants do not dispute that the requirements of the first four subsections of § 547(b) are satisfied. Rather, they assert that the trustee cannot establish a *prima facie* case for recovery because he cannot meet the requirements of § 547(b)(5). To satisfy the requirements of § 547(b)(5), the trustee must establish that the transfer yielded the creditor a greater return on its debt than it would have received if the transfer had not taken place and it had received a distribution under a Chapter 7 liquidation. *See Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 644 n.2 (3d Cir. 1991); *see also In re El Paso Refinery, L.P.*, 171 F.3d 249, 253 (5th Cir. 1999) (same); *cf. Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936) (under section 60a of the Bankruptcy Act, a payment was considered to be a preference if it enabled the creditor "to obtain a greater percentage of [its] debt than any other of such creditors of the same class"). In other words, when a trustee commences a § 547 preference action, the court is to compare "what the creditor actually received and what it would have received under the chapter 7 distribution provisions of the Code" in order to determine whether the creditor received more than its fair share. 2 Collier on Bankruptcy ¶ 547.03[7][a] (15th rev. ed. 2003).

The trustee asserts that the hypothetical liquidation analysis of § 547(b)(5) should be conducted as of the filing date of the bankruptcy petition. He maintains that, since the debtor here had not yet decided, as of the filing date, whether to assume or reject its agreement with the defendants, they were in no better position than general unsecured creditors and were entitled to only a *pro rata* distribution on account of their claims. The trustee reasons that, by making the pre-petition payments to the defendants, the debtor preferred them over other unsecured

creditors because the unsecured creditors of Kiwi's estate will not be paid 100% on account of their claims.

We disagree with the trustee's characterization of defendants as being similarly situated to general unsecured creditors for purposes of a § 547(b)(5). We believe the trustee's analysis disregards the unique set of rights provided to the defendants by § 365, and, in the case of the CIT Group, by § 1110 as well.

## B.   *11 U.S.C. § 365*

Section 365 authorizes trustees or debtors in possession, such as Kiwi, to assume or reject any executory contract[5] or unexpired lease of the debtor, subject to court approval. 11 U.S.C. § 365(a). In order to assume such an agreement, the debtor in possession must cure defaults and provide assurance of future performance. Specifically, § 365(b)(1) provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

---

5. As we explained in *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, an executory contract is a "contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." 872 F.2d 36, 39 (3d Cir. 1989) (quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 Minn. L. Rev. 439, 460 (1973) and collecting cases adopting Countryman's definition).

11 U.S.C. § 365(b)(1).

Once an assumption order is entered, the creditor must perform in accordance with the terms of the assumed agreements. However, as a matter of fairness, before requiring the creditor to perform, courts require the debtor in possession to "give[ ] the other contracting party the full benefit of [its] bargain." H.R. Rep. No. 95-595, at 348 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6304-05; *see also Matter of Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1174 (7th Cir. 1996). In other words, the debtor must cure all defaults, assure future performance, and make the other contracting party whole before it may be permitted to assume the agreement. As we explained in *Columbia Gas System*, "[b]ecause assumption acts as a renewed acceptance of the terms of the executory bargain, the Bankruptcy Code provides that the cost of performing the debtor's obligations is an administrative expense of the estate, which will be paid first out of the assets of the estate." *In re Columbia Gas System Inc.*, 50 F.3d 233, 238-39 (3d Cir. 1995). By contrast, general unsecured creditors are entitled to receive only a *pro rata* distribution of the debtor's unencumbered assets that remain after such priority claims and others are paid. *See generally* 11 U.S.C. §§ 726, 507, 506. *See also In re Baker & Getty Financial Services, Inc.*, 106 F.3d 1255, 1259 n.7 (6th Cir. 1997). For this reason, a creditor whose contract is assumed under § 365 is not similarly situated to general unsecured creditors.

The trustee's characterization of the defendants' claims as unsecured on the filing date seems to presuppose that a hypothetical Chapter 7 trustee would have elected to reject the debtor's agreements with them. Had the agreements been rejected, the breach of the agreements would have been deemed to have occurred immediately before the filing of the petition and the defendants would have been allowed general unsecured claims. *See* 11 U.S.C. § 365(g)(1); *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984). However, the agreements here were not rejected and they would not necessarily have been rejected in a hypothetical Chapter 7 liquidation.[6] Once the debtor assumed the agreements, the

6. The agreements could have been assumed and assigned in a Chapter 7 liquidation. Although the principal duty of the chapter 7 trustee is

defendants were no longer unsecured creditors because the defendants "had more than a simple unsecured claim for a sum of money." *In re LCO Enterprises*, 12 F.3d 938, 942 (9th Cir. 1993). Rather, all of the defendant-creditors were entitled, pursuant to § 365, to full payment of the amounts owed under the agreements.

## C. *11 U.S.C. § 1110*

In addition to being in a more favorable position than general unsecured creditors because of its entitlement under § 365, the CIT Group was also in a better position for another reason. It was entitled to payment in full of all amounts owing under its leases with the debtor or to a return of its property under the § 1110 stipulation approved by the Bankruptcy Court, which allowed the debtor to retain possession of aircraft equipment post-petition.[7] At the time that the debtor and the CIT Group entered into the stipulation, section 1110 provided that:[8]

---

"collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest," 11 U.S.C. § 704(1), section 721 of the Code allows bankruptcy courts to authorize a chapter 7 trustee to operate the debtor's business for a limited period of time, if operation of the business is in the best interest of the estate and consistent with an orderly liquidation. *See* 11 U.S.C. § 721.

7. In the context of one of TWA's bankruptcy filings, we explained the interplay between §§ 365 and 1110 as follows:

> A § 1110 agreement . . . operates neither as an assumption nor as a rejection of the entire lease, but rather obligates the debtor to perform the lease obligations *as they come due,* in return for the protection of the automatic stay. After the § 1110 agreement is made, the debtor remains free to make a formal assumption or rejection of the lease and, until that time or such time as the § 1110 agreement is breached or terminated, the automatic stay of § 362 remains in effect.

*In re Trans World Airlines, Inc.*, 145 F.3d 124, 137 (3d Cir. 1998) (emphasis in original).

8. Section 1110 was revised in 2000. *See* Pub. L. 106-181, Title VII, § 744(b), Apr. 5, 2000, 114 Stat. 177. The parties do not contend that the 2000 revisions, which were not in effect at the time that they entered into the § 1110 stipulation, affect our analysis of the statute.

(a)(1) [t]he right of a secured party with a security interest in equipment described in paragraph (2) or of a lessor or conditional vendor of such equipment to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract is not affected by section 362, 363, or 1129 or by any power of the court to enjoin the taking of possession unless—

(A) before the date that is 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after the date of the order under such security agreement, lease, or conditional sale contract; and

(B) any default, other than a default of a kind specified in section 365(b)(2), under such security agreement, lease, or conditional sale contract—

(i) that occurs before the date of the order is cured before the expiration of such 60-day period; and

(ii) that occurs after the date of the order is cured before the later of—

(I) the date that is 30 days after the date of the default; or

(II) the expiration of such 60-day period.

11 U.S.C. § 1110(a).

We have explained the purpose of § 1110 in the context of another airline bankruptcy:

Section 1110 was designed in part to increase availability of low-interest capital to the transportation industry. Toward this end, § 1110 renders § 362's automatic stay effective for only 60 days following the filing of the petition in bankruptcy. After that time, the lessor is free to repossess the aircraft in the event of breach by the debtor unless, within those 60 days, the debtor enters into what is referred to as a "§ 1110 agreement." If a § 1110 agreement is executed, which requires court approval but not the lessor's consent, the automatic stay remains in effect. In return for this

> protection, the debtor or its trustee must "perform all obligations of the debtor that become due on or after such date [on which the § 1110 agreement is entered into] under such . . . lease" and cure any prior or future defaults. 11 U.S.C. § 1110(a).

*In re Trans World Airlines, Inc.*, 145 F.3d at 137 (citations omitted). Thus, § 1110 allows aircraft lessors to repossess their collateral sixty days after the filing of the debtor's bankruptcy petition. In the alternative, the debtor and the lessor may enter into a court-approved stipulation which allows the debtor to retain possession of the leased aircraft equipment by curing defaults and making the required lease payments. *See* H. R. Rep. No. 95-595, at 405 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6361; *see also Seidle v. GATX Leasing Corp.*, 778 F.2d 659, 662 (11th Cir. 1985).

In this case, the 60-day period expired on November 29, 1996 and, thereafter, the CIT Group did not exercise its right to take possession of the aircraft equipment. Following the expiration of the 60-day period, the debtor and the CIT Group negotiated the terms under which the debtor would be permitted to retain possession of the aircraft equipment. On January 15, 1997, the Bankruptcy Court entered an order approving the § 1110 stipulation between the debtor and the CIT Group. Pursuant to the stipulation, Kiwi agreed to perform all of its obligations under the CIT leases, as modified, going forward and to cure any and all pre-petition and post-petition defaults. On July 18, 1997, the Bankruptcy Court entered an assumption order in which the Court authorized the debtor to assume its leases with the CIT Group and assign them to KIH in connection with the bankruptcy sale. The order provided that events of default existed under the CIT leases and the § 1110 stipulation, but that, notwithstanding the defaults, the CIT Group would accept payments from the debtor and KIH in amounts set forth in a letter agreement in satisfaction of the requirements of § 365.

The trustee contends that notwithstanding § 1110, the payments from the debtor to CIT constituted preferential transfers of its property under § 547. We disagree. We find instructive the Eleventh Circuit's opinion in *Seidle v. GATX Leasing*, which addressed "the relationship and tension"

between §§ 547 and 1110. 778 F.2d at 661-62. In *Seidle*, with bankruptcy court approval, the debtor entered into a § 1110 stipulation with a creditor from which it had purchased aircraft equipment pre-petition. The stipulation provided that the debtor would cure defaults owing under a promissory note it executed when it bought the aircraft equipment and that the debtor would make payments going forward in order to retain possession of the aircraft equipment. *See id.* at 661. The bankruptcy court subsequently appointed two Chapter 11 co-trustees to replace the debtor's management, one of whom later resigned. *See id.* The trustees continued using the aircraft equipment, but did not make the payments required under the stipulation. After the creditor repossessed the aircraft equipment and obtained an administrative expense claim for amounts not paid by the trustees, one of the trustees filed a preference action against it, seeking to recover pre-petition payments made by the debtor. *See id.* at 662. The Eleventh Circuit upheld the district court's grant of summary judgment in favor of the defendant. *See id.* at 666.

The court reasoned that allowing the trustee to set aside the pre-petition payments "would undermine the protection that section 1110 provides for creditors. Pursuant to the section 1110 stipulation, a creditor is entitled to unpaid pre-petition payments, as defaults; a trustee may not later thwart the effect of the statute by challenging the validity of these transfers as preferences." *Id.* at 665. The court explained that the trustee could not satisfy § 547(b)(5) because the pre-petition payments did not improve the creditor's position under the distributive provisions of the Bankruptcy Code because, had it not received the payments pre-petition, it would have received payment reflecting their amount when the bankruptcy court approved the stipulation. *See id.*

We agree with the *Seidle* court that entry of a § 1110 stipulation precludes the trustee from bringing a preference action against a creditor who received pre-petition payments from the debtor for the same reason that § 365 precludes such a suit. In sum, the payments to all three of the defendants here are not recoverable as preferences

because, had the creditors not received the payments pre-petition, they would have received amounts reflecting those sums, in any event, when the Bankruptcy Court approved the cures of the assumed agreements. And, further, in the case of the CIT Group, both the order approving the stipulation and the assumption order preclude recovery by the trustee.

### C. *"The Preference Carve-Out"*

In support of his claim that the payments made by the debtor in this case were preferential transfers, the trustee directs the Court's attention to the provisions of the Term Sheet, which he refers to as "the preference carve-out." He asserts that the Term Sheet creates a fact issue as to whether he may recover under § 547 because it provides that all preference actions which were not settled at the time of the July 18, 1997, Consent Order would remain with the estate after the bankruptcy sale. The trustee asks the Court to conclude that he may prosecute his actions against the defendants because they did not secure releases from preference liability at a time when similarly situated, prudent creditors did. In this regard, he argues that the Bankruptcy Court would not have ordered Northwest Airlines to pay $100,000 in consideration for release from preference liability if all parties had been subject to automatic releases. Additionally, the trustee notes that his reading of the Term Sheet is consistent with the Creditors' Committee's representation to the Bankruptcy Court, in its application for appointment of a trustee, that the Committee had preserved avoidance actions for prosecution for the benefit of the estate.

We agree with the Bankruptcy and District Courts that, as a matter of law, the Term Sheet did not carve preference claims out of payments made on account of the assumed agreements. The Bankruptcy Court, which was familiar with the terms of the bankruptcy sale over which it had presided, read the Term Sheet, rather, as providing that avoidance actions, such as § 547 suits, would remain in the estate and would not be transferred to KIH in the bankruptcy sale. In other words, the Term Sheet was read as carving preference claims out of the assets sold to KIH,

rather than as preserving the ability of a subsequently appointed trustee to carve them out of cure payments made on account of the assumed agreements.

In assessing the trustee's reading of the Term Sheet, the Bankruptcy Court noted that defendants were not similarly situated to Northwest Airlines, the creditor who obtained a release from preference actions. The important distinction which the Court relied upon in regard to the Northwest release was that the debtor did not assume and assign to KIH its agreements with Northwest Airlines, as it did its agreements with the defendants. Rather, the Consent Order entered into by the debtor, KIH, Northwest Airlines, and the Creditors' Committee provides that Northwest Airlines will "execute new agreements with KIH." (Sabre App. at 89). Based on this distinction, Northwest Airlines might have decided to secure a release in recognition that any pre-petition payments it received from the debtor could give rise to colorable preference claims because they were not on account of assumed agreements.

After distinguishing Northwest Airlines' situation from that of the defendants, the Bankruptcy Court reasoned that, in any event, the provisions of the Term Sheet could not invalidate the legal effect of the assumption of the debtor's agreements with the defendants. The Bankruptcy Court based its reasoning on *LCO Enterprises*. In *LCO Enterprises*, the Ninth Circuit rejected the notion that the parties had entered into an "implied preference immunity agreement . . . which precluded the Trustee's suit against [the landlord]." 12 F.3d at 943. The court opined that it was unlikely that the landlord would have agreed to rent concessions had it understood that it would have to return payments made by the debtor as a result of a preference action. *See id.* The court also opined that it was reasonable to assume that, when the parties stipulated to the amount of the pre-petition arrearage, they assumed that amounts already paid by the debtor would not be returned to the debtor's estate. *See id.* However, the court was "unwilling to elevate those reasonable assumptions into finding as a matter of law that the parties impliedly agreed that [the landlord] would be immune from any preference action. . . ." *Id.* The court reasoned that it was dangerous to find

implied terms in an agreement entered into by certain parties where unrelated parties could be expected to rely and act on the terms of the agreement. *See id.* After deciding against finding as a matter of law that the parties impliedly agreed that the landlord would enjoy immunity from preference actions, the court concluded that "[w]hether or not [the debtor] and [the landlord] agreed between themselves that [the debtor] would not seek to recover the prepetition payments, the assumption of the leases in accordance with § 365(b) precludes the Trustee from attempting to recover those payments. The Trustee cannot have his leased property and his rent payments, too." 12 F.3d at 943-44.

The rationale of *LCO Enterprises* is readily applied to the case before us. The circumstances surrounding assumption suggest that Kiwi and the defendants did not agree to cure amounts with the understanding that a subsequently appointed trustee could recover payments made on account of the assumed agreements. Each of the defendants made concessions, including allowing the debtor to cure the defaults on the assumed agreements by paying less than the full amount owed. For instance, the Port Authority waived all of its pre-petition debt; Sabre agreed to waive 20% of the pre-petition debt owed to it once KIH paid the other 80%; and CIT agreed to reduce the past due amounts under the stipulation it entered into with the debtor. In these circumstances, it is reasonable to assume that, when the defendants agreed to accept cure payments in amounts less than they were owed, they could not have anticipated that a subsequently appointed trustee would seek to recover payments made by the debtor pre-petition. For example, we doubt that a sophisticated party like the Port Authority would have agreed to waive its pre-petition claim if it anticipated being sued for return of pre-petition payments it received for more than $1.5 million. Had it anticipated that a subsequently appointed trustee would seek to recover pre-petition payments made by the debtor, it is more likely that the Port Authority would have required the debtor to pay at least $1,551,000 to cure its pre-petition defaults.

Regardless, neither the purported preference carve-out nor any implied preference agreements are of any

consequence because we conclude that the trustee's preference actions against each of the defendants was precluded, as a matter of law, by the debtor's earlier assumption of its agreements with them and, in the case of the CIT Group, by the § 1110 stipulation as well.

## D. *Discovery*

The trustee asserts that the Bankruptcy Court erred by preventing him from obtaining discovery as to the nature of the payments made to the defendants, specifically whether they were related to the contracts which were assumed, and as to the circumstances surrounding the assumption of the contracts. Defendants respond by pointing out that the trustee did not inform the Bankruptcy Court what particular information he sought and that, even if he discovered additional information, they would still be entitled to dismissal of the preference actions because entry of the assumption order barred such suits as a matter of law. We review questions concerning the scope or opportunity for discovery for an abuse of discretion. *See Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (citing *Country Floors Inc. v. Gepner & Ford*, 930 F.2d 1056, 1062 (3d Cir. 1992)), *cert. denied*, 532 U.S. 958 (2001).

We agree with the District Court that the Bankruptcy Court did not abuse its discretion by denying the trustee's request for additional discovery. Nothing in the record suggests that the payments received by the defendants pre-petition were not made on account of the assumed agreements. Indeed, the trustee conceded at oral argument that the payments he sought to recover were made on account of the assumed agreements. Therefore, we do not discern an abuse of discretion in the Bankruptcy Court's denial of the trustee's request for discovery on this point.

The trustee was also not entitled to discovery concerning circumstances surrounding the assumptions. The Bankruptcy Court had the power to rescind assumption orders upon a showing that the parties obtained the assumption order by fraud. *See Superior Toy*, 78 F.3d at 1175. However, in this case, counsel for the trustee explained that the trustee was not "mak[ing] an allegation

that any of these defendants engaged in fraud." (Sabre App. at 327). Because he did not ask the Bankruptcy Court to revisit the assumption orders based on fraud, the trustee may not collaterally attack the assumption orders with information generated through discovery obtained in the instant preference actions. We therefore conclude that the District Court correctly determined that the Bankruptcy Court did not abuse its discretion by denying the trustee discovery concerning the circumstances surrounding the assumptions.

## IV.  *Conclusion*

After carefully considering the arguments discussed above and all other arguments advanced by appellant, we affirm the District Court's order affirming the Bankruptcy Court's dismissal of the preference actions brought by the trustee against the Port Authority, Sabre, and the CIT Group.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*